Verna Mae **NELSON**, Individually, and as Personal Representative for Curtis Ray Nelson, deceased, Plaintiff–Appellant,

v.

Michael **POLLAY**, M.D., and Oklahoma Memorial Hospital, Defendants–Appellees.

No. 80299.

Supreme Court of Oklahoma.

Feb. 20, 1996.

Rehearing Denied May 15, 1996.

---

Rick E. Romano, Romano & Romano, Oklahoma City, for Appellant.

Perry T. Marrs, Jr., Short Wiggins Margo & Adler, Oklahoma City, for Appellee Pollay.

Charles L. Waters, General Counsel, Richard W. Freeman, Jr., Assistant General Counsel, Charles M. Jackson, Assistant General Counsel, Department of Human Services, Oklahoma City, for Appellee Oklahoma Memorial Hospital.

OPALA, Judge.

This public-law controversy presents three questions: (1) Does the 1985 Governmental Tort Claims Act [GTCA or Act][1] shield *faculty physicians*—who are teaching in a medical education program at Oklahoma Memorial Hospital [OMH or hospital]—from tort liability to a patient for negligence in providing medical or surgical services? (2) Does the 1985 version of the GTCA allow OMH to be answerable in tort (*dehors* the respondeat superior doctrine)—in a manner coextensive with the standards of liability that govern private hospitals—for the negligence of non-employee-physicians occurring in the course of providing medical or surgical services at the hospital? and (3) Did the trial court err in giving summary judgment to the defendant faculty physician and to OMH? We answer the first question in the negative and the second and third in the affirmative, and remand the cause for further proceedings not inconsistent with this opinion.

I

THE ANATOMY OF LITIGATION

Curtis Ray Nelson [Nelson] sought damages for inadequate medical treatment received after his admittance to OMH on January 27, 1986.[2] Nelson earlier had been diagnosed as suffering from neurofibromatosis.[3] Dr. Michael Pollay[4] [Pollay or faculty physician] treated him and supervised Dr. Bruce Pendleton [Pendleton], a non-party resident physician who was Nelson's *primary* doctor and surgeon.[5] Nelson's condition supposedly deteriorated during the ten-day period between his admittance (on January 27) and a laminotomy[6] (on

---

1. 51 O.S.Supp.1985 §§ 151 et seq.

2. "Oklahoma Memorial Hospital" operated under that name for only thirteen years. *See* 56 O.S.Supp.1980 § 401 (adopting the title "Oklahoma Memorial Hospital" effective July 1, 1980); 63 O.S.Supp.1993 § 3202.1 (reinstating the institution's earlier name of "University Hospital" effective July 1, 1993).

3. "Neurofibromatosis" is a disease commonly known as "Elephant Man's Disease" in which multiple tumors of various sizes slowly grow on peripheral nerves, including ones that can wrap around and enter the spinal cord. Taber's Cyclopedic Medical Dictionary 1203 (American Jurisprudence Proof of Facts, 3d Series, 16th ed. 1989). Nelson had been diagnosed to suffer from this disease at least 19 years earlier. His condition was coupled with spastic quadriparesis, multiple intraspinal neurofibroma and a seizure disorder.

4. Pollay is a Professor of Neurosurgery and Chief of the Department of Neurosurgery at the University of Oklahoma College of Medicine.

5. Two other *non-party resident physicians* provided medical services to Nelson: (1) Dr. Mark Talley (who performed two myelograms) and (2) Dr. Donald Horton (who examined Nelson the day he was admitted to OMH).

6. A laminotomy is a division of one of the vertebral laminae, which are the flattened parts of either side of the vertebral arch. *Taber's, supra* note 3 at 995–996. The surgery was performed to remove multiple tumors that were growing into and compressing the patient's spinal column and spinal cord. Nelson allegedly suffered from this procedure permanent spinal cord damage.

February 6) performed by Pendleton under Pollay's supervision and direction.[7]

Nelson filed his pre-suit notice of claim on February 11, 1988[8] and commenced this medical malpractice action against Pollay and OMH on June 7, 1988. He alleged that his extensive physical deficiencies were caused by the delay and the improper performance of tendered medical treatment. OMH pressed for summary judgment on three grounds: (a) immunity from liability under the GTCA, (b) Nelson's failure either to establish any *independent negligence* by OMH or its employees or (c) to comply with the Act's pre-suit notice provisions before commencing the action. Pollay's summary judgment quest relies on (a) GTCA-conferred immunity from liability and (b) his nonliability either as an attending physician or in supervising resident interns. The summary judgment given to *both* defendants[9] rests solely on their immunity from tort liability under the terms of the 1985 GTCA.

Nelson died during the pendency of this action. His next of kin and personal representative, who was then substituted as plaintiff,[10] appeals.

## II

## THE *1985* VERSION OF THE GTCA DID NOT CONFER IMMUNITY UPON *FACULTY PHYSICIANS* FOR NEGLIGENCE OCCURRING IN THE DELIVERY OF HEALTH–CARE SERVICES

■ Dr. Pollay's immunity from liability turns on our construction of the *1985* GTCA—the version in effect when the alleged injuries in suit occurred (between January 27 and February 6, 1986). The common-law doctrine of sovereign immunity was abrogated by our pronouncement in *Vanderpool v. State.*[11] The legislature later codified Oklahoma's sovereign immunity by enacting the 1984 GTCA,[12] which contained comprehensive statutory parameters for governmental tort liability.[13] Section

---

7. Nelson was admitted to OMH on January 27, 1986. Two myelograms, which are diagnostic radiographic or roentgenographic studies that produce pictures of tumors using radiopaque dye, were performed on Nelson (one on January 28 and the other on the 29th). *Taber's, supra* note 3 at 1167, 1614. On February 1, 1986, Nelson received a magnetic resonance imaging [MRI] treatment, a procedure where protons or neutrons are magnetized to provide images of certain areas of the body and to assist in determining the location of tumors. *Taber's, supra* note 3 at 1226. Plaintiff's expert witness criticized the laminotomy as both untimely and improperly performed.

8. According to Nelson: [1] his pre-suit notice (to the Office of Risk Management, the Attorney General, and the Department of Human Services on February 11, 1988) was filed within 90 days of the date he discovered that his condition (paraplegia) was permanent (51 O.S.Supp.1985 § 156(B)); [2] his claim was deemed denied 90 days later on May 11, 1988 (51 O.S.Supp.1984 § 157(A)); and [3] his suit was timely filed on June 7, 1988 (within 180 days of the claim's denial) (51 O.S.Supp.1984 § 157(B)).

9. The pertinent portions of the summary judgment, filed August 21, 1992, are:

"The Court ... finds that said Motions [for Summary Judgment] should be granted as a matter of law based upon the immunity provisions of the Governmental Tort Claims Act. The Court does not express opinion concerning Defendants' arguments on statute of limitations. IT IS THEREFORE ORDERED that Defendants' Motions for Summary Judgment are hereby granted."

10. An action for personal injury is survivable under the provisions of 12 O.S.1991 § 1053. *Haws v. Luethje,* Okl., 503 P.2d 871, 873 (1972). Added following Nelson's death was a claim for wrongful death.

11. *Vanderpool v. State of Oklahoma ex rel. Oklahoma Historical Society,* Okl., 672 P.2d 1153, 1156–57 (1983), teaches that in the absence of a statute conferring partial or total immunity, the state, its political subdivisions and their employees acting within the scope of their employment would stand liable in tort in the same manner as a private individual or corporation. *See also Anderson v. Eichner,* Okl., 890 P.2d 1329, 1336 n. 15 (1994).

12. *See* Okl.Sess.L.1984, Ch. 226, effective October 1, 1985.

13. The terms of 51 O.S.Supp.1984 § 152.1 (effective October 1, 1985) are:

"A. The State of Oklahoma does hereby adopt the doctrine of sovereign immunity. The state, its political subdivisions, and all of their employees acting within the scope of

152.1[14] sets out that governmental immunity of the state and its political subdivisions is waived "only to the extent and in the manner provided in" the Act. Subject only to the Act's specific *limitations and exceptions,* the GTCA extends governmental accountability to all torts for which a private person or entity would be liable.[15] In *Anderson v. Eichner* [16] we construed the 1986 and 1989 versions of the GTCA. There we held that the purview of protection from liability created by the Act does not encompass the practice of the healing art by providing medical or surgical services to patients.[17] We likewise conclude today that the *1985* version of the Act does *not* confer immunity on *faculty physicians* who are rendering medical services.

■ The cardinal rule of statutory construction calls for a judicial search to ascertain legislative intent.[18] The plaintiff argues that the legislature intended to place faculty physicians outside the scope of their employment while they are providing medical or surgical services to patients. We agree.

■ State employees acting within the scope of their employment are relieved by § 152.1(A) [19] of private liability for tortious conduct. This immunity grant allows public employees to perform their duties and make decisions on behalf of the state free from fear of suit.[20] In the task of determining whether Pollay (a *faculty physician* )—because of his employment status with the state—is immune from liability for the tort in suit, our analysis must begin with the definitional portion of the Act (§ 152(5)) [21] in which state employees are described. The § 152(5) text

their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts.

B. The state, *only to the extent and in the manner provided in this act,* waives its immunity and that of its political subdivisions. In so waiving immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution." (Emphasis added.)

**14.** For the pertinent provisions of 51 O.S.Supp. 1984 § 152.1, see *supra* note 13.

**15.** The terms of 51 O.S.Supp.1985 § 153 provide:

"A. The state or a political subdivision shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment *subject to the limitations and exceptions specified in this act* and only where the state or political subdivision, if a private person or entity, would be liable for money damages under the laws of this state. The state or a political subdivision shall not be liable under the provisions of this act for any act or omission of an employee acting outside the scope of his employment.

B. The liability of the state or political subdivision under this act shall be exclusive and in place of all other liability of the state, a political subdivision or employee at common law or otherwise." (Emphasis added.)

**16.** *Anderson, supra* note 11 at 1337.

**17.** *Anderson, supra* note 11 at 1337.

**18.** *Anderson, supra* note 11 at 1337; *So–Lo Oil Company, Inc. v. Total Petroleum, Inc.,* Okl., 832

P.2d 14, 18 (1992); *Humphrey v. Denney,* Okl., 757 P.2d 833, 835 (1988); *Matter of Phillips Petroleum Co.,* Okl., 652 P.2d 283, 285 (1982); *Lancaster v. State,* Okl., 426 P.2d 714, 716 (1967); *State v. Dinwiddie,* 186 Okl. 63, 95 P.2d 867, 869 (1939).

**19.** *See supra* note 13 for the pertinent terms of 51 O.S.Supp.1984 § 152.1(A).

**20.** *See Anderson, supra* note 11 at 1336; *Neal v. Donahue,* Okl., 611 P.2d 1125, 1129 (1980). *See also Wilson v. Gipson,* Okl., 753 P.2d 1349, 1351–1352 (1988).

**21.** The terms of 51 O.S.Supp.1984 § 152(5) (effective October 1, 1985) provided:

"5. 'Employee' means any person who is authorized to act in behalf of a political subdivision or the state whether that person is acting on a permanent or temporary basis, with or without being compensated or on a full-time or part-time basis. Employee also includes all elected or appointed officers, members of governing bodies and other persons designated to act for an agency or political subdivision, but the term does not mean a person or other legal entity while acting in the capacity of an independent contractor or an employee of an independent contractor. *For the purpose of this act, physicians acting in a nonadministrative capacity,* except for resident physicians and interns, *practicing at the State of Oklahoma Teaching Hospitals are not employees or agents of the state."* (Emphasis added.)
Section 152(5) was extensively amended in 1986. That amendment was interpreted in *Anderson, supra* note 11. The 1986, 1990, 1991, 1992, 1993 and 1994 amendments of § 152(5) *have no effect on this litigation.*

creates a dichotomous division of *faculty physicians* into two distinct categories: (a) those acting in an administrative capacity (i.e., teachers) and (b) those who are not acting in an administrative capacity, such as physicians who are "practising medicine" at state teaching hospitals. For their tortious conduct as *teachers* the Act provides that the state is liable; for their like acts or omissions as *practitioners*, the state is not. The final provision in § 152(5) [22] clearly *takes* the employee/teaching-physicians *out of the scope of their employment* when they are practising medicine—whether for educational or other purposes—yet *leaves them* within the protection of respondeat superior [23] liability for those duties which are *unrelated to* treatment of patients.

In support of his immunity analysis, Pollay urges there is a distinction between "private physicians" and "faculty physicians". He contends that because physician-patient relationships with the former professionals are voluntarily formed while the latter cannot turn away patients, faculty physicians are immune from liability while providing medical services. Moreover, Pollay argues, im-

munity for faculty physicians while providing medical treatment advances legitimate public interests of the state in the delivery of medical services to the poor at substantially reduced levels of compensation. Just as firmly as we did so in *Anderson,* [24] we reject once more today's invitation to create a discriminatory distinction between medical treatment rendered to a "*state*" patient and that given to a *private* patient. Patients are not to be accorded a pariah legal status based on some means' test that would single out poor persons for a different treatment. [25] The plain language of the statute will not support this interpretation. Had the legislature intended to distinguish between liability for negligence in the rendition of medical treatment arising from a physician's role in the educational process and that occurring in the course of medical treatment arising from non-educational activities, it would have expressed that purpose in § 152(5).

In sum, we hold that the 1985 GTCA does not shield Pollay from tort liability for negligence in providing medical or surgical services to Nelson. [26]

---

**22.** For the pertinent provisions of 51 O.S.Supp. 1984 § 152(5), see *supra* note 21.

**23.** Under the doctrine of respondeat superior a principal or employer is generally held liable for those acts of an agent or employee which fall within the latter's employment or authority. *Qui facit per alium facit per se* (the act of the employee is the act of the employer). This rule rests on the premise that, when exercising delegated authority, the employee stands under the complete control of the employer. *Texaco, Inc. v. Layton,* Okl., 395 P.2d 393, 396–397 (1964). *See also Braden v. Hendricks,* Okl., 695 P.2d 1343, 1352 (1985); *Elias v. Midwest Marble and Tile Co.,* Okl., 302 P.2d 126, 127–128 (1956); *Mid–Continent Pipeline Co. v. Crauthers,* Okl., 267 P.2d 568, 571 (1954); *World Pub. Co. v. Smith,* 195 Okl. 691, 161 P.2d 861, 863 (1945). In most jurisdictions, the theory of respondeat superior is not extended to a hospital if the doctor is considered a private self-employed contractor. This view is applicable when a doctor-patient relationship pre-exists the patient's admission to the hospital. *See Weldon v. Seminole Municipal Hospital,* Okl., 709 P.2d 1058, 1059–1060 (1985). Under the theory of ostensible agency, a hospital can be vicariously liable for the negligence of a physi-

cian, notwithstanding the physician's independent contractor status, when the patient looks for treatment "solely to the hospital" rather than viewing the facility as merely "the situs where his physician would treat him for his problems." *Id.*

**24.** *Anderson, supra* note 11 at 1339.

**25.** We express no opinion today whether the physicians' noble efforts constitute a "state interest", but note that their pursuit cannot override a statutory enactment that gives them no immunity. *See Anderson, supra* note 11 at 1339 (holding that the GTCA contemplates neither (a) a dichotomous division of patients, who are malpractice plaintiffs, based upon a means' test nor (b) a judicial assessment of the doctors' beneficent motivation in providing medical services).

**26.** Because we conclude that the 1985 GTCA does not shield faculty physicians from tort liability, we need not reach the issue whether Pollay's purchase of liability insurance operates as a waiver of governmental immunity.

## III

**UNDER THE 1985 VERSION OF THE GTCA, OMH IS ANSWERABLE IN TORT FOR THE NEGLIGENCE OF NONEMPLOYEE–PHYSICIANS WHO PROVIDE HEALTH–CARE SERVICES AT THE HOSPITAL IN A MANNER CO–EXTENSIVE WITH THE STANDARDS OF LIABILITY THAT GOVERN PRIVATE HOSPITALS**

### A.

### *Statutory Immunity Theory*

■ OMH urges it is immune from liability for the tortious acts of Pollay *or any other physician* in connection with Nelson's injuries. Our attention is directed to the terms of 51 O.S.1991 § 152(5), which provide in part that "in no event shall the state be held liable for the tortious conduct of any physician, resident physician or intern while practicing medicine or providing medical treatment to patients." [27]

■ The quoted provisions of § 152 can lend no support to OMH's immunity quest in this case. The statutory text invoked was *added* to the definitional section of "state employee" *after the occurrence of Nelson's injuries.* [28] The version that governs the Nelson claim—51 O.S.Supp.*1984* § 152(5)—provided that *"physicians acting in a nonadministrative capacity,* except for resident physicians and interns, *practicing at the State of Oklahoma Teaching Hospitals are not employees or agents of the state."* [29] No intent can be divined from the *applicable 1985* version of § 152(5) to confer immunity on state teaching hospitals for those negligent acts of nonemployee-physicians which fall *dehors* the law's doctrine of respondeat superior. In short, under the provisions of the 1985 Act, OMH is answerable in tort in a manner co-extensive with the standards of liability that govern private hospitals under the same or like circumstances.[30] 51 O.S.Supp.1985 § 153. A statutory grant of immunity must be explicit—immunity will not be divined from a legislative text that is silent, doubtful or ambiguous.[31]

Although OMH is immune from respondeat superior liability for negligent acts of nonemployee-physicians acting in the delivery of health-care services,[32] its statutory grant of immunity does not extend to negligent acts or omissions by those OMH *employees* who are not physicians.[33]

---

**27.** The quoted text was added to § 152(5) effective July 1, 1986. (Okl.Sess.L.1986, Ch. 247, § 21) and has not been changed by the 1990, 1991, 1992, 1993 and 1994 amendments of that section. The harm in suit occurred during the period between January 27 and February 6, 1986.

**28.** *See* discussion, *supra* note 27.

**29.** *See* 51 O.S:Supp.1984 § 152(5) (emphasis added), *supra* note 21.

**30.** While faculty physicians who are rendering medical services are not state employees, their nonemployee status does not relieve a state hospital of its responsibility properly to credential medical-staff physicians. *Strubhart v. Perry Memorial Hosp. Trust Auth.,* Okl., 903 P.2d 263, 274–276 (1995), teaches that a hospital has an *independent duty*—owed directly to its patients—to exercise ordinary care in extending and supervising medical-staff privileges to physicians. Although state hospitals do not bear respondeat superior liability for negligence of faculty physicians—who are statutorily deemed nonemployees—these institutions are nonetheless answerable in tort *for their own negligence* in the credentialing process.

**31.** *Anderson, supra* note 11 at 1339; *Ingram v. State,* Okl., 786 P.2d 77, 80 (1990); *Gunn v. Consolidated Rural Water & Sewer District No. 1,* Okl., 839 P.2d 1345, 1349 (1992); *Huff v. State,* Okl., 764 P.2d 183, 185 (1988); *Jarvis v. City of Stillwater,* Okl., 669 P.2d 1108, 1111 (1983) (both *Huff* and *Jarvis* were abrogated by statutory amendments unrelated to the provisions which are tendered for our consideration in this case, see *Bolin v. State,* Okl.App., 838 P.2d 29, 30 (1992)).

**32.** We need not address today (as we did in *Anderson, supra* note 11 at 1337) the issue whether the 1985 GTCA affords immunity to *resident physicians* and *interns.*

**33.** *See in this connection Strubhart, supra* note 30 at 271; *Eversole v. Oklahoma Hosp. Founders Assn.,* Okl., 818 P.2d 456, 461–462 (1991). The teachings of *Weldon, supra* note 23 at 1059, upon which OMH relies, afford no foundation for its immunity analysis. Drawn from the principles

## B.

### Nonliability– and Limitations– Based Challenges

■ Although the trial court based its summary disposition solely on statutory immunity, OMH reasserts its *nonliability* and *bar-of-limitation* theories that were pressed below in its arguments for summary disposition of the claim.[34] An appellate court will not make first-instance determinations of law or fact. That is the trial court's function in every case—whether in law, equity or on appeal from an administrative body.[35] Because *only* OMH's *statutory immunity* argument came under nisi prius scrutiny, we cannot craft an initial decision upon any of the *untried issues* tendered on appeal. In short, all these issues must first be resolved by the trial court.

## IV

## CONCLUSION

The 1985 GTCA's language is clear—*faculty physicians* are employees of the state acting within the scope of their employment when they are engaged in the performance of administrative duties, *except when practising medicine*. The claim before us arose *from the treatment of a patient, not from acts of teaching or administering*. Defendant Pollay was delivering medical services while engaged in the art of healing at a state teaching hospital. He is not shielded from liability by the 1985 version of the GTCA. Nor is OMH protected by the Act from liability (that falls *dehors* the doctrine of respondeat superior) for the negligence of nonemployee-physicians in the delivery of health-care services at its facility. For those delicts it is answerable in tort in a manner co-extensive with the standards of liability that govern private hospitals. The legislature has broad power in crafting the state's public tort liability. Its intent *not to shield* with immunity faculty physicians and state teaching hospitals is manifest from the statutory scheme in effect when Nelson's harm took place.

We hold that the purview of protection from liability created by the 1985 GTCA extends neither to (a) a faculty physician practising medicine or providing treatment to patients at a state teaching hospital nor (b) to a state teaching hospital for that conduct by nonemployee-physicians in providing medical or surgical services at the hospital for which private tort law would afford redress *dehors* the respondeat superior doctrine.[36]

■ We express no opinion with respect to the actionability of the Nelson claim. This cause must be remanded for a nisi prius consideration of all untried issues to be resolved. The summary judgment to Pollay and OMH cannot stand. When on the judgment's reversal a cause is remanded it re-

---

of the common law's vicarious liability in tort, they defy intermixture with statutory immunity principles.

**34.** The limitations-based challenge is whether—in a medical malpractice suit—a defendant's fraudulent concealment of injury extends the time (required by the GTCA) to give pre-suit notice. This argument is based on the so-called discovery rule, which is recognized as applicable in medical malpractice suits. 76 O.S.1991 § 18; *Reynolds v. Porter*, Okl., 760 P.2d 816, 820 n. 8 (1988); *McCarroll v. Doctors General Hosp.*, Okl., 664 P.2d 382, 385–386 (1983). The critical determination—whether Nelson knew or should have known he was injured—is fact intensive. We can neither weigh those facts nor say as a matter of law (without having both the facts before us and their trial court's resolution) whether the discovery rule is to be applied.

**35.** When necessary findings of fact and conclusions of law are absent, the case must be remanded with directions that they be made by the trial court. *Toxic Waste Impact Group, Inc. v. Leavitt*, Okl., 890 P.2d 906, 913 (1995); *Dyke v. St. Francis Hospital*, Okl., 861 P.2d 295, 300 n. 13 (1993); *Matter of Estate of Pope*, Okl., 808 P.2d 640, 642 (1990); *Robert L. Wheeler, Inc. v. Scott*, Okl., 777 P.2d 394, 399 (1989); *Teel v. Teel*, Okl., 766 P.2d 994, 999 n. 19 (1988); *American Ins. Ass'n v. Indus. Com'n*, Okl., 745 P.2d 737, 740 n. 15 (1987); *Sandpiper North Apartments v. Am. Nat. Bank*, Okl., 680 P.2d 983, 993 (1984); *Matter of Estate of Bartlett*, Okl., 680 P.2d 369, 377 (1984); *Davis v. Gwaltney*, Okl., 291 P.2d 820, 824 (1955).

**36.** *Strubhart, supra* note 30 at 274–276.

turns to the trial court as if it had never been decided, save only for the "settled law" of the case.[37] On remand the parties are relegated to their prejudgment status.

The trial court's summary judgment is reversed and the cause remanded for further proceedings not inconsistent with this pronouncement.

ALMA WILSON, C.J., KAUGER, V.C.J., and LAVENDER, HARGRAVE and SUMMERS, JJ., concur.

SIMMS, J., concurs in Parts I and II and dissents from Part III.

HODGES and WATT, JJ., dissent.

---

37. *Fent v. Okl. Nat. Gas,* Okl., 898 P.2d 126, 134 (1995); *Thomas v. National Auto. & Cas. Ins. Co.,* Okl., 875 P.2d 424, 428 (1994); *Dyke, supra* note

35 at 304; *Parker v. Elam,* Okl., 829 P.2d 677, 682 (1992); *Seymour v. Swart,* Okl., 695 P.2d 509, 512–513 (1985).