2012 OK CIV APP 55

**JMA ENERGY COMPANY, LLC,**
**Plaintiff/Appellee,**

v.

**STATE of Oklahoma ex rel. DEPART-**
**MENT OF TRANSPORTATION,**
**Defendant/Appellant.**

No. 109,089.

Court of Civil Appeals of Oklahoma,
Division No. 2.

March 13, 2012.

Michael E. Smith, Sharon T. Thomas, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, Oklahoma, for Plaintiff/Appellee.

Kelly F. Monaghan, Lori Gilliard, Holloway & Monaghan, Tulsa, Oklahoma, for Defendant/Appellant.

DEBORAH B. BARNES, Presiding Judge.

¶1 Defendant/Appellant State of Oklahoma *ex rel.* Department of Transportation (DOT) appeals the trial court's Order filed on December 14, 2010, denying DOT's exception to the report of appraisers. The issues on appeal concern the Oklahoma Surface Damages Act (SDA), 52 O.S.2011 §§ 318.2–318.9. DOT argues it is exempt from operation of the SDA and, therefore, Plaintiff/Appellee JMA Energy Company, LLC, (JMA) has no right, absent DOT's consent, to undertake drilling operations on land whose surface owner is the State. Based on our review of the record on appeal and applicable law, we find DOT is not exempt from operation of the SDA and, therefore, we affirm the Order denying DOT's exception to the report of appraisers.

## FACTS AND PROCEDURAL BACKGROUND

¶2 In January of 2009, JMA filed a petition to appoint appraisers pursuant to the SDA. JMA stated it was intending "to serve as operator in the drilling and completion of an oil and/or gas well" on certain property, that DOT is the surface owner of a portion of this property, and that "[b]y virtue of the express and implied terms and provisions of certain oil and gas leases and/or related operational agreements of JMA covering the mineral rights in the Subject Property, JMA has the right to enter and conduct oil and gas drilling operations on the Subject Property." [1]

¶3 JMA further stated it had complied with the SDA (1) by notifying DOT of its intention to drill, (2) by initiating efforts to negotiate a surface damage agreement for any damages which might occur to DOT's property, and (3) by filing an appropriate bond or security. JMA stated that despite its efforts to reach an agreement with DOT concerning potential surface damages, the parties had been unable to reach an agreement. Therefore, JMA petitioned the trial court pursuant to 52 O.S. Supp.2002 § 318.5 [2] for appointment of appraisers to make recommendations concerning the amount of damages, if any.

¶4 In February of 2009, DOT filed a motion to dismiss and stay proceedings. DOT argued that "[s]overeign immunity precludes the State from being sued unless such sovereign immunity has been waived.... Because the [SDA] does not waive sovereign immunity, and the State has not waived such immunity either expressly or by implication, [JMA's] Petition must be dismissed." [3]

¶5 Following a hearing held on March 6, 2009, the trial court, in an order filed on March 17, 2009, stated as follows:

In reviewing the requirements of the [SDA], JMA followed proper procedure in requesting appointment of appraisers. Title 52 O.S. Sec. 318.5 sets out the process by which an operator of heavy equipment shall negotiate with the surface owner for

---

1. R., p. 1.

2. Title 52 O.S. Supp.2002 § 318.5 provides in part as follows:

   A. Prior to entering the site with heavy equipment, the operator shall negotiate with the surface owner for the payment of any damages which may be caused by the drilling operation. If the parties agree, and a written contract is signed, the operator may enter the site to drill. If agreement is not reached, or if the operator is not able to contact all parties, the operator shall petition the district court in the county in which the drilling site is located for appointment of appraisers to make recommendations to the parties and to the court concerning the amount of damages, if any. Once the operator has petitioned for appointment of appraisers, the operator may enter the site to drill.

3. R., p. 6.

the payment of any damages which may be caused by any drilling operation. JMA in doing so did not file suit against the State but rather petitioned the Court to have appraisers appointed to establish the extent of any damages.[4]

¶ 6 The trial court further stated that the SDA explicitly exempts property held by an Indian, an Indian tribe, or by the United States for any Indian tribe, but does not explicitly exempt property held by the State. The trial court concluded that "[t]he State of Oklahoma is not immune from suit in this type of case," and denied DOT's motion to dismiss and stay proceedings. Following the trial court's denial, DOT filed an "Application to Assume Original Jurisdiction and Petition for Writ of Mandamus or in the Alternative for Writ of Prohibition" in the Oklahoma Supreme Court,[5] which the Supreme Court denied in an order filed in May of 2009.[6]

¶ 7 In July of 2009, DOT again filed a motion to dismiss,[7] arguing that because JMA had not taken any action since May of 2009, that JMA had failed to diligently prosecute pursuant to Oklahoma District Court Rule 9(b).[8] JMA filed a response along with a motion for sanctions against DOT.[9] JMA argued there had been no failure to prosecute and that all delays had been caused, instead, by DOT.

¶ 8 A hearing on DOT's motion to dismiss and on JMA's motion for sanctions was held on January 7, 2010. The trial court, ruling from the bench, denied DOT's motion to dismiss and denied JMA's request for sanctions against DOT. The trial court appointed two additional appraisers in addition to the appraiser already appointed by JMA.

¶ 9 The three appraisers filed their report in May of 2010.[10] The report of the appraisers states that the "quantity" of property utilized by JMA in the drilling operation of which DOT is the surface owner is 0.77 acres, and that "the resulting diminution in the fair market value" of DOT's surface estate caused by JMA's operations is $1,925.

¶ 10 In June of 2010, DOT filed an exception to the report of the appraisers. DOT stated it was specially appearing for the limited purpose of filing its exception, and that it "expressly preserves its defense that [the trial court] lacks jurisdiction because the State is immune from suit under the [SDA]."[11] In November of 2010, DOT filed a "Continued Special Appearance for Application to Set Hearing and Request for Findings of Fact and Conclusions of Law."[12]

¶ 11 Following a hearing held on November 23, 2010, the trial court, in an Order filed on December 14, 2010, denied DOT's exception to the report of the appraisers. From this Order, DOT appeals.[13]

## STANDARD OF REVIEW

¶ 12 The issues on appeal, concerning the status of Oklahoma's common-law sovereign immunity as well as statutory interpretation, are issues of law. "In cases involving questions of law relating to statutory interpretation, the appropriate standard of review is *de novo* ...." *Hubbard v. Kaiser–Francis Oil Co.*, 2011 OK 50, ¶ 6, 256 P.3d 69, 72 (citations omitted). Regarding sovereign immunity, "[t]he standard of review for questions concerning the jurisdictional power of the trial court to act is de novo." *Dilliner v. Seneca–Cayuga Tribe*, 2011 OK 61, ¶ 12, 258 P.3d 516, 519 (citation omitted).

## ANALYSIS

### I. Common–Law Sovereign Immunity

¶ 13 DOT argues that because the SDA does not specifically waive the State's sovereign immunity, DOT, as a State agency, is exempt from operation of the SDA. In *Van-*

---

4. R., p. 21.

5. R., p. 23.

6. *See* R., p. 72, ¶ 3, and R., p. 76, ¶ 6.

7. R., p. 72.

8. 12 O.S.2011, ch. 2, app.

9. R., p. 75.

10. R., p. 101.

11. R., p. 107 n. 1.

12. R., p. 145.

13. DOT's motion to have the Oklahoma Supreme Court retain the appeal was denied by the Supreme Court in an order filed on May 17, 2011.

*derpool v. State,* 1983 OK 82, 672 P.2d 1153, the Oklahoma Supreme Court explained, "[t]he doctrine of sovereign immunity was first recognized in early England and required that the sovereign could not be sued without his permission." *Vanderpool,* ¶ 7, 672 P.2d at 1154.

The doctrine found its way into the common law of the United States, and in 1821, in *Cohens v. Virginia,*[14] Chief Justice Marshall applied it in suits against the United States, declaring that suits could not be commenced or prosecuted against the federal government without its consent. Subsequently, the doctrine was applied to the states.

*Id.* ¶ 8, 672 P.2d at 1154.

¶ 14 The Court explained that at the state level, "it was early recognized that local government entities occupy a dual character...." *Id.* On one hand, a state is "charged with governmental functions and responsibilities," and on the other it is "a corporate body, capable of much the same acts as a private corporation...." *Id.* "This duality resulted in the attempted differentiation between governmental and proprietary functions, the first generally protected by immunity, the second generally not." *Id.* (footnote omitted).

¶ 15 The Court explained that this differentiation proved to be too cumbersome, and "resulted in confusion and uncertainty...." *Id.* ¶ 9, 672 P.2d at 1154–55. The Court, therefore, held "that the governmental-proprietary-function inquiry shall no longer be determinative in assessing liability for tort as to all levels of government in this State," *id.* ¶ 18, 672 P.2d at 1156, and abrogated common-law sovereign immunity for injury

caused by the negligent or wrongful act or omission of any governmental entity or any employee or agent of the governmental entity while acting within the scope of employment, *id.* ¶¶ 19–22, 672 P.2d at 1156–57.

¶ 16 DOT argues that *Vanderpool* abrogated common-law sovereign immunity only as to tort claims. However, the Oklahoma Supreme Court has subsequently interpreted *Vanderpool* as completely abrogating common-law sovereign immunity. *See, e.g., Fehring v. State Ins. Fund,* 2001 OK 11, ¶ 23, 19 P.3d 276, 283 ("this Court abrogated common-law sovereign immunity in *Vanderpool v. State* ...."); *McCathern v. City of Oklahoma City,* 2004 OK 61, ¶ 15, 95 P.3d 1090, 1096 ("The common-law doctrine of sovereign immunity was abrogated in 1983 by *Vanderpool v. State*."). In Oklahoma, governmental immunity must now be established statutorily. *State ex rel. State Ins. Fund v. JOA, Inc.,* 2003 OK 82, ¶ 17, 78 P.3d 534, 539. *See also Sullins v. American Medical Response of Oklahoma, Inc.,* 2001 OK 20, 23 P.3d 259, 266 (Opala, J., concurring in result) ("[i]n contrast to federal law, Oklahoma's immunity regime is governed solely by legislative enactments. The common-law doctrine of sovereign immunity stands abrogated *in toto* ....").[15] Therefore, Oklahoma's common-law sovereign immunity has been abrogated, and DOT must point to some statute that creates sovereign immunity from the operation of the SDA.

## II. The Sovereign Immunity Established in the Governmental Tort Claims Act

¶ 17 In 1984, following the abrogation of common-law sovereign immunity in *Vander-*

---

14. *Cohens v. Virginia,* 19 U.S. 264, 6 Wheat. 264, 5 L.Ed. 257 (1821).

15. Regarding Oklahoma's sovereign immunity from claims brought pursuant to *federal law,* see, for example, *Freeman v. State ex rel. Dept. of Human Services,* 2006 OK 71, 145 P.3d 1078. In *Freeman,* "Pamela Freeman sued the Department of Human Services of the State of Oklahoma in the District Court of Tulsa County, for failure to pay overtime under the Fair Labor Standards Act, 29 USC § 201 et seq." *Id.* ¶ 1, 145 P.3d at 1078. The Oklahoma Supreme Court stated that the United States Congress does not have "the power to subject nonconsenting States to private suits for damages in state

courts." *Id.* ¶ 3, 145 P.3d at 1079 (quoting *Alden v. Maine,* 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)). The Court stated, "for Freeman to prevail ... the State of Oklahoma must have consented to suit in its own courts under the Fair Labor Standards Act." *Freeman,* ¶ 3, 145 P.3d at 1079. In the context of federal law, "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today ... except as altered by the plan of the Convention or certain constitutional Amendments." *Id.* ¶ 4, 145 P.3d at 1079 (quoting *Alden* at 712–13, 119 S.Ct. 2240).

*pool,* the legislature "both adopted the doctrine of sovereign immunity and waived it 'only to the extent and in the manner provided'" in the Governmental Tort Claims Act (GTCA). *Hull v. Wellston Ind. Sch. Dist. I 004,* 2002 OK CIV APP 46, ¶ 7, 46 P.3d 180, 182 (citations omitted). DOT argues the GTCA statutorily establishes complete sovereign immunity for the State. However, case law reveals that the GTCA establishes sovereign immunity only in the realm of torts.

¶ 18 For example, in *JOA, Inc.,* the State argued "that sovereign immunity barred any award of attorney's fees against it except when this immunity was removed." *JOA, Inc.,* 2003 OK 82, ¶ 1, 78 P.3d at 535. However, the Oklahoma Supreme Court responded that because governmental immunity must be established by statute, the State "must point to some statute that creates this immunity to paying attorney's fees." *Id.* ¶ 17, 78 P.3d at 539. The Court rejected the State's reliance on the adoption of sovereign immunity by the legislature in the GTCA because the GTCA only establishes sovereign immunity with respect to tort actions. *Id.* The Court stated, for instance, that the sovereign immunity from certain tort actions established in the GTCA "is not a shield to actions based upon contractual obligations of a state entity." *Id.* ¶ 9, 78 P.3d at 537 (citation omitted). The State failed to point to a statute establishing sovereign immunity from the attorney fee award, and the Court "decline[d] to judicially create a governmental immunity from attorney's fees . . . ." *Id.* ¶ 20, 78 P.3d at 540.

¶ 19 Similarly, in *Sholer v. State ex rel. Department of Public Safety,* 1997 OK 89, 945 P.2d 469, the Oklahoma Supreme Court recognized that the GTCA applies only to tort claims against the State or a political subdivision of the State. In *Sholer,* the Court specifically found that "the GTCA provides no bar" to the parties' non-tort related claim seeking "a refund of the amount overpaid for license reinstatement" from the State. *Sholer,* ¶ 15, 945 P.2d at 472–73.

¶ 20 In *Lucas v. Canadian Valley Area Vocational Technical School of Chickasha, Dist. No. 6,* 1992 OK CIV APP 1, 824 P.2d 1140, this Court reached the same conclusion regarding the applicability of the sovereign immunity established in the GTCA, stating as follows:

> The Legislature's intention to limit the [GTCA] to tort actions and claims is evident not only in the statutory short title— The Governmental *Tort* Claims Act (51 O.S.Supp.1990 § 151), but also in § 152.1 of the Act, which adopts the doctrine of sovereign immunity from liability for *torts.* The Supreme Court has found the scope of liability in § 153 of the Act to be limited to *torts* committed within the scope of employment, subject to other limitations and exceptions in the Act.

*Lucas,* ¶ 8, 824 P.2d at 1141 (citation omitted). *See also Duncan v. City of Nichols Hills,* 1996 OK 16, ¶ 18, 913 P.2d 1303, 1308 ("the legislature intended the [GTCA] to apply to tort actions brought against the state or a political subdivision . . . ."). Therefore, the GTCA only establishes sovereign immunity as to torts.

### III. The Surface Damages Act

¶ 21 DOT argues that the SDA is inapplicable to property owned by the State because nothing in the SDA constitutes a waiver of sovereign immunity or implies that the SDA was intended to abrogate the State's sovereign immunity. However, as stated above, sovereign immunity must be established statutorily, and "[i]mmunity cannot be read into a legislative text that is silent, doubtful or ambiguous." *Gunn v. Consol. Rural Water & Sewer Dist. No. 1, Jefferson County,* 1992 OK 131, ¶ 7, 839 P.2d 1345, 1349 (footnote omitted). Although the GTCA establishes sovereign immunity as to tort claims, this case does not involve a tort. Rather, this case involves a lessee's plan to undertake a drilling operation and its attempt to notify and, ultimately, compensate a surface owner pursuant to the SDA for any damages caused by the drilling operation.

Regarding the legal concept of a lessee's right of access, the common law has long recognized that an oil and gas lease carries with it the right to use the land as may be necessary to perform the obligations under the lease . . . and, that an oil and gas lessee may enter and occupy the surface of

the land to the extent reasonably necessary for exploring and marketing oil and gas. The common-law right of access for drilling and production operations is limited not only to the extent it is reasonably necessary but also as provided in the [SDA]. Under the surface damages statutory regime, the oil and gas lessee must engage in negotiations with the surface owner and seek an appraisal of surface damages ... and the surface owner is entitled to damages caused by the reasonable use of the surface by the oil and gas lessee.

*Lierly v. Tidewater Petroleum Corp.*, 2006 OK 47, ¶ 20, 139 P.3d 897, 903 (citations and emphasis omitted).[16]

■ ¶ 22 Title 52 O.S.2011 § 318.2 [17] sets forth the definitions to be used in the SDA. It provides:

> For purposes of Sections 1 through 8 of this act:
>
> 1. "Operator" means a mineral owner or lessee who is engaged in drilling or preparing to drill for oil or gas; and
>
> 2. "Surface owner" means the owner or owners of record of the surface of the property on which the drilling operation is to occur.[18]

As stated by the Oklahoma Supreme Court in *YDF, Inc. v. Schlumar, Inc.*, 2006 OK 32, 136 P.3d 656,

> The purpose of the [SDA] is to promote the prompt payment of compensation [to] a surface owner whose land is taken for oil and gas exploration. The Oklahoma Legislature enacted the [SDA] to provide a mechanism to balance the conflicting inter-

ests of the owners of two of our State's most important resources; the mineral interest owner and the surface owner. The [SDA] states Oklahoma's policy regarding damage of land caused by oil and gas drilling operation while balancing the interests of oil and gas operators with those of surface owners.

*YDF, Inc.*, ¶ 10, 136 P.3d at 659 (citations omitted).

■ ¶ 23 Although the SDA specifically exempts Indian lands pursuant to § 318.7, the SDA is silent as to lands owned by the State. In an analogous context, in *State ex rel. Commissioners of the Land Office v. Corporation Commission*, 1987 OK 126, 747 P.2d 306, a company drilled and operated a gas well on land leased from the State. The State argued it is not subject to the oil and gas conservation laws of Oklahoma and that the Corporation Commission has no jurisdiction over state lands. *Id.* ¶ 5, 747 P.2d at 307. The Oklahoma Supreme Court held that the State is not exempt from Corporation Commission jurisdiction, and that "state lands are not exempt from state oil and gas conservation laws." *Id.* ¶ 7, 747 P.2d at 308. In construing those laws, the Court found "nothing to suggest that state lands are exempt from the operation of this statute," and found "no indication in this statute exempting state lands from the operation of the state's oil and gas laws." *Id.* ¶ 6, 747 P.2d at 308.

¶ 24 DOT asserts that the property at issue "consist[s] of [a] railroad right-of-way on an active railway." [19] There is no indication in the record that the drilling operation

---

16. "The cardinal rule of statutory construction calls for a judicial search to ascertain legislative intent." *McCathern v. City of Oklahoma City*, 2004 OK 61, ¶ 16, 95 P.3d 1090, 1096 (footnote omitted). "The Court presumes that the Legislature expressed its intent and that it intended what it expressed." *King v. King*, 2005 OK 4, ¶ 22, 107 P.3d 570, 579 (footnote omitted). "Statutes are interpreted to attain that purpose and end championing the broad public policy purposes underlying them. Only where the legislative intent cannot be ascertained from the statutory language, i.e. in cases of ambiguity or conflict, are rules of statutory construction employed." *Id.* ¶ 22, 107 P.3d at 579–580 (footnotes omitted).

17. Although the present case was commenced prior to 2011, we will reference the 2011 statutory compilation for statutes upon which we rely or discuss in this Opinion unless there has been an amendment to or other change in the earlier statutory compilation.

18. The SDA further states that "[n]othing in this act shall be construed as repealing or limiting the jurisdiction, authority and power of the Oklahoma Corporation Commission," 52 O.S.2011 § 318.8, and it states that "[n]othing herein contained shall be construed to impair existing contractual rights," *id.* § 318.7.

19. DOT's Brief-in-Chief, p. 13.

has interfered with the railroad. In fact, DOT states that the drilling operation merely "encroaches upon" property "adjacent to" the railroad.[20] We note that, as quoted above, JMA's "common-law right of access for drilling and production operations" is limited not only as provided in the SDA, but it is also limited "to the extent it is **reasonably necessary** ...." *Lierly,* 2006 OK 47, ¶ 20, 139 P.3d at 903 (citation omitted). Regardless, although we are not confronted with the oil and gas conservation laws in this case, we are guided by the Court's analysis in *State ex rel. Commissioners of the Land Office.* As in *State ex rel. Commissioners of the Land Office,* the SDA does not exempt state lands from its operation, nor is there anything in the SDA to suggest that state lands are exempt from its operation. Rather, the purpose of the SDA is to promote the prompt payment of compensation to the surface owner (here, DOT) while also allowing operators (here, JMA) to undertake drilling operations for oil and gas.

¶ 25 In order to invoke the doctrine of sovereign immunity in a statute, the legislature must do so in express, unambiguous terms, such as it did in the GTCA. *See Lafalier v. Lead–Impacted Communities Relocation Assistance Trust,* 2010 OK 48, ¶ 16, 237 P.3d 181, 189 (the legislature did not invoke the State's sovereign immunity in the statute in question because "[w]hen the legislature has invoked the State's sovereignty, it has done so in express, unambiguous terms as it [did in the GTCA]...."). As stated above, common-law sovereign immunity has been abrogated in Oklahoma, *Fehring,* 2001 OK 11, ¶ 23, 19 P.3d at 283, and it must now be established statutorily, *JOA, Inc.,* 2003 OK 82, ¶ 17, 78 P.3d at 539. The legislature could have exempted state lands in the SDA, but chose only to exempt Indian lands. *See* 52 O.S.2011 § 318.7. Although the legislature has amended sections of the SDA as recently as 1990 and 2002, it has not amended the SDA to invoke the State's sovereignty in express and unambiguous terms. *See* 52 O.S. Supp.1990 § 318.4; and 52 O.S. Supp. 2002 § 318.5. Because the SDA does not establish sovereign immunity for the State,

or otherwise exempt the State from its operation, we must conclude that the legislature intended to maintain the SDA's "mechanism [for] balanc[ing] the conflicting interests of the owners of two of our State's most important resources; the mineral interest owner and the surface owner," even when the surface owner is the State. *YDF, Inc.,* ¶ 10, 136 P.3d at 659 (citation omitted).

> The [SDA] was a recognition [by the legislature] that not only are the mineral resources or wealth underlying the surface a vital resource which support an important industry in our State, but the surface is also a vital resource which supports development of business, industry and residential endeavors, and our vital agricultural industry. The [SDA] was an attempt to guarantee the development of one industry is not undertaken at the expense of another when the vitality of both is of great consequence to the well-being of our State economy.

*Houck v. Hold Oil Corp.,* 1993 OK 166, ¶ 17, 867 P.2d 451, 457 (citations omitted). We find DOT is not exempt from operation of the SDA.

## CONCLUSION

¶ 26 Based on our review of the record on appeal and applicable law, we find DOT is not exempt from operation of the Surface Damages Act, 52 O.S.2011 §§ 318.2–318.9. Therefore, we affirm the trial court's December 14, 2010 Order denying DOT's exception to the report of appraisers.

¶ 27 **AFFIRMED.**

FISCHER, C.J., and WISEMAN, J., concur.

20. *Id.*